IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| C EVANS CONSULTING LLC, et al., | * | |
| Plaintiffs, | * | |
| v. | * | Civil Action No. GLR-21-2493 |
| SORTINO FINANCIAL, LLC, et al., | * | |
| Defendants. | * | |

\*\*\*

## MEMORANDUM OPINION

THIS MATTER is before the Court on Plaintiffs C Evans Consulting LLC ("Evans Consulting") and Cecelia Evans Laray's ("Evans") Motion to Remand (ECF No. 29). The Motion is ripe for disposition and no hearing is necessary. See Local Rule 105.6 (D.Md. 2021). For the reasons outlined below, the Court will deny the Motion.

### I.   BACKGROUND

**A.   Factual Background**[1]

Plaintiffs bring this lawsuit against Defendants Sortino Financial, LLC ("Sortino Financial"), Paul Sortino, Cornerstone Accounting Solutions, Inc. ("Cornerstone"), Lawrence R. Smith, James H. Foster, Jr., Pentegra Services, Inc. d/b/a Pentegra Retirement Services ("Pentegra"), National Life Insurance Company ("National Life"), and Life Insurance Company of the Southwest ("LSW"). (Am. Compl. ¶¶ 3–10, ECF No. 5).

---

[1] Unless otherwise noted, the Court takes the following facts from the Amended Complaint (ECF No. 5) and accepts them as true. See Erickson v. Pardus, 551 U.S. 89, 94 (2007).

Plaintiffs allege that Defendants owed a fiduciary duty to Plaintiffs and, notwithstanding that duty, recommended and sold to Plaintiffs a retirement plan, known as an Internal Revenue Code 412(e)(3) defined benefit plan (a "412(e)(3) plan"), that was "completely unsuitable and inappropriate for" Plaintiffs. (Id. at 4).

Evans founded Evans Consulting in January 2015. (Id. ¶ 14). Evans Consulting provides various services, including federal market advising and leadership coaching. (Id.). Smith and Cornerstone began serving as Evans Consulting's certified public accountants at Evans Consulting's formation. (Id. ¶ 15). Smith and Cornerstone also prepared the company's tax returns and occasionally assisted with payroll tax reporting. (Id.). In May 2018, when Evans began considering retirement plans for herself and Evans Consulting's employees, Smith recommended she meet with Sortino. (Id. ¶ 20).

Evans met with Sortino and Foster, who collectively did business as Sortino Financial, along with Smith on May 29, 2018. (Id. ¶ 21). Sortino suggested that Evans set up both a 401(k) and a 412(e)(3) plan and further suggested she could pay for his services for both plans on either a fee basis or a commission structure. (Id. ¶¶ 21–22). Sortino advised that most of his clients opted for a commission structure through which fees would be paid "based 'on his success.'" (Id. ¶ 22). This statement was false, as Sortino Financial would receive a fee "immediately upon the sale of the annuity and life insurance policy in the defined benefit plan he was pitching to Evans Consulting" and its "primary fee would not come from asset performance." (Id.).

National Life and Pentegra both produced informational materials suggesting that 412(e)(3) plans were ideal for owners of small businesses with very few employees. (Id.

2

¶¶ 25–26). Sortino Financial did not provide Evans with these materials during their meeting and did not otherwise explain that the 412(e)(3) plan they were recommending may not be appropriate for a company like Evans Consulting, which already had eight employees and intended to grow quickly to more than twenty-five employees. (Id. ¶ 28). Several other factors also suggested that a 412(e)(3) plan would not be a good fit for Evans Consulting. (Id.). Sortino and Smith nevertheless suggested that "instead of paying taxes to the IRS, Evans Consulting would be funding her retirement through the effective use of tax savings received through deductions from the plan." (Id. ¶ 30).

Over the coming months, Evans provided Sortino extensive materials about Evans Consulting's and her own finances. (Id. ¶¶ 33–34). After she provided these materials, Sortino continued to "extol[] the virtues of" a 412(e)(3) plan. (Id. ¶ 36). He "disclosed none of the risks involved with adopting a 412(e)(3) plan" or "the substantial fees that he and his firm would earn from the sale of life insurance products necessary to fund the plan." (Id.). On or about August 15, 2018, Evans signed the required paperwork to implement the 401(k) and 412(e)(3) plans (collectively, the "Plan"). (Id. ¶ 42). National Life provided the 412(e)(3) plan that Sortino sold Evans Consulting and Pentegra administered it. (Id. ¶ 39). The Plan was initially funded by a life insurance policy purchased on Evans' life with a face value of $2,200,689. (Id. ¶ 43). Sortino told Evans on or about September 11, 2018 that she would owe a payment of approximately $47,000 on the life insurance policy the following month. (Id. ¶ 44).

One week later, on September 18, 2018, Sortino emailed Evans and informed her that Evans Consulting would need to contribute $194,706 to the Plan for 2018 and that the

likely 2019 contribution would be closer to $300,000. (Id. ¶ 45). In March 2019, Sortino emailed Smith in which he incorrectly stated that no employees other than Smith would be eligible to participate in the Plan until 2020. (Id. ¶ 47). That same month, on Sortino's instructions, "a flexible premium deferred annuity contract was purchased" for the Plan, with Evans as the annuitant and the Plan as the owner. (Id. ¶ 48). In December 2019, Sortino discussed the Plan with Evans and a senior Evans Consulting employee. (Id. ¶ 49). Sortino disclosed that Evans Consulting would have to pay several hundreds of thousands of dollars to fund policies on Plan participants who would become eligible on February 15, 2020. (Id.). Sortino also said that although "he had not yet excluded anyone from the Plan, he would go 'back to the drawing board,' to attempt to find ways to exclude certain of the participants." (Id.).

Evans was "complete[ly] surprise[d]" by the need to add so many participants and the accompanying cost because Sortino had repeatedly told her "that she would be able to exclude nearly all of Evans Consulting's employees from the Plan." (Id. ¶ 53). Contrary to the assurances Evans had received from Sortino, Foster, and Smith, "an additional eleven Evans Consulting employees became eligible to participate in the Plan" in February 2019 and "accrued benefits with a present value of $407,346 according to the Plan valuation as of February 15, 2020." (Id. ¶ 54). Sortino had not planned "what would happen with respect to paying the costs of additional employees' insurance once they qualified for the Plan." (Id. ¶ 53).

Evans told Sortino that Evans Consulting could not afford the Plan and it "would need to be closed as expeditiously as possible." (Id. ¶ 49). Sortino assured Evans he would

4

move quickly to close the Plan, but that he could not do so before February 15, 2020, when "certain employees would have to be added to the Plan for a one-month period." (Id. ¶ 50). Sortino said that the cost to add the participants to the Plan for that brief period would be "nominal." (Id.). With Pentegra's approval, the Plan was "frozen" starting March 15, 2020. (Id. ¶ 51).

On or about March 19, 2020, Sortino Financial emailed Evans to inform her that Evans Consulting would need to make "a 'small contribution' . . . to cover" the additional employees covered by the Plan. (Id. ¶ 56). But in July 2020, Sortino emailed Evans again to notify her that "the 'numbers came back much higher than we anticipated' with regard to Evans Consulting's required contributions." (Id. ¶ 57). Two days later, Sortino emailed Evans and notified her that Evans Consulting would have to contribute approximately $691,000 for the employees in the Plan to become fully vested before the company could close the Plan. (Id. ¶ 59). Plaintiffs now "face[] severe penalties and taxes from the IRS for failing to fund the Plan and for taking disallowed deductions in connection with terminating the Plan." (Id. ¶ 61).

In practice, the Plan did not meet the requirements of a 412(e)(3) plan. (Id. ¶ 64). Among other things, a 412(e)(3) plan is funded exclusively by the purchase of individual insurance contracts funded by premium payments extending not later than the retirement age for each individual participating in the plan. (Id.). In the case of the Plan, the only participant for whom an insurance contract was purchased was Evans, and its premiums were payable for forty-five years, well past her retirement age. (Id.). The failure of the Plan

to satisfy the requirements of 412(e)(3) ultimately resulted in significant financial consequences. (Id. ¶¶ 65–66, 69).

**B.     Procedural History**

On July 20, 2021, Plaintiffs filed this action in the Circuit Court for Baltimore County, Maryland. (ECF No. 3). Plaintiffs filed an Amended Complaint on August 13, 2021. (ECF No. 5). The Amended Complaint contains four counts: Professional Negligence Against all Defendants (Count I); Breach of Fiduciary Duty Against Defendants Sortino Financial Group, Sortino, Foster, Smith, and Cornerstone, National Life and Southwest (Count II); Declaratory Judgment (Count III); and Unjust Enrichment Against All Defendants that Received Fees, or Commissions and Premiums (Count IV). (Id. ¶¶ 71–99). Plaintiffs seek compensatory damages, disgorgement, attorneys' fees and costs, and declaratory judgment. (Id. at 31–32). Defendants removed the case to this Court on September 29, 2021. (ECF No. 1).

Defendants have filed four separate Motions to Dismiss, all of which remain pending. (ECF Nos. 25, 26, 27, 42). Plaintiffs filed a Motion to Remand on October 29, 2021. (ECF No. 29). On November 3, 2021, the Court granted the parties' joint request to extend Plaintiffs' time to respond to Defendants' Motions to Dismiss until thirty days after the Court resolved the Motion to Remand. (See ECF No. 35). Defendants National Life and LSW filed an Opposition to Plaintiffs' Motion to Remand on November 22, 2021. (ECF No. 41). Plaintiffs filed a Reply on December 17, 2021. (ECF No. 43).

## II.     DISCUSSION

### A.     Standard of Review

A defendant may remove a state court action to federal court if the federal court would have original jurisdiction over the action. 28 U.S.C. § 1441(a). Federal district courts have original jurisdiction over civil actions that arise under federal law, 28 U.S.C. § 1331, or have an amount in controversy exceeding $75,000, exclusive of interests and costs, and complete diversity of citizenship, 28 U.S.C. § 1332(a).

A party seeking removal carries the burden of establishing federal jurisdiction. Mulcahey v. Columbia Organic Chems. Co., 29 F.3d 148, 151 (4th Cir. 1994); Middel v. Middel, 471 F.Supp.3d 688, 692 (D.Md. 2020). The Court must strictly construe removal jurisdiction because it raises significant federalism concerns. Mulcahey, 29 F.3d at 151. Congress has expressed a "clear intention to restrict removal and to resolve all doubts about the propriety of removal in favor of retained state court jurisdiction." Medish v. Johns Hopkins Health Sys. Corp., 272 F.Supp.3d 719, 722 (D.Md. 2017). Accordingly, if federal jurisdiction is doubtful, the Court should grant a motion to remand. Mulcahey, 29 F.3d at 151.

"When a civil action is removed solely under [§] 1441(a), all defendants who have been properly joined and served must join in or consent to the removal of the action." 28 U.S.C. § 1446(b)(2)(A). Defendants must do so "independently or by unambiguously joining in or consenting to another defendant's notice, within the thirty-day period following service of process." Costley v. Serv. Prot. Advisors, LLC, 887 F.Supp.2d 657,

7

658 (D.Md. 2012) (quoting Anne Arundel Cnty. v. United Pac. Ins., 905 F.Supp. 277, 278 (D.Md. 1995)).

**B.     Analysis**

Plaintiffs argue that Defendants improperly removed the case from state court on two grounds. First, Plaintiffs contend that remand is required because not all Defendants properly consented to the request for removal. (Mem. Law Supp. Mot. Remand ["Mot."] at 5–8, ECF No. 29-1). Second, Plaintiffs argue that their causes of action are based on state law and their references to federal laws and regulations are insufficient to establish federal question jurisdiction. (Id. at 8–25). The Court will address each argument in turn. At bottom, Plaintiffs are incorrect on both points and the Court will deny the Motion.

   **1.     Unanimous Consent for Removal**

As set forth above, "all defendants who have been properly joined and served must join in or consent to the removal of the action." 28 U.S.C. § 1446(b)(2)(A). Relying on an unpublished 2008 decision by this Court, Plaintiffs argue that Cornerstone's consent to removal was ineffective because that consent came not from Cornerstone's counsel, but from Smith. (Mot. at 5); see Shifflett v. A.C. & R. Insulation Co., No. WDQ-07-2397, 2008 WL 11509451 (D.Md. Oct. 15, 2008). In Shifflett, this Court held that the defendant companies who consented to removal through a letter written by the companies' secretary and treasurer had not properly consented because corporations must be represented by counsel, and the non-attorney's consent was therefore a nullity. Shifflett, 2008 WL 11509451, at *3. Accordingly, the Court found that there was not unanimous consent and remanded the case to state court. Id.

8

A later decision by the United States Court of Appeals for the Fourth Circuit, however, limited that holding from Shifflett and provided Fourth Circuit courts with guidance in reviewing situations such as this. See Mayo v. Bd. of Educ. of Prince George's Cnty., 713 F.3d 735 (4th Cir. 2013). In Mayo, the Fourth Circuit held that "a notice of removal signed and filed by an attorney for one defendant representing unambiguously that the other defendants consent to the removal satisfies the requirement of unanimous consent for purposes of removal." Id. at 742. In this case, as in Mayo, LSW and National Life represented in the notice of removal that they obtained the consent of all Defendants. (See Notice Removal at 4, ECF No. 1 ("All Defendants consent to this removal.")). Accordingly, there is no lack of unanimous consent and the Court cannot grant Plaintiffs' Motion on these grounds.[2]

---

[2] The Court notes that Plaintiffs attempt in their Reply to distinguish Mayo by arguing that there, all parties were represented by counsel, even if not all represented parties individually notified the Court through counsel of their consent to removal. (Reply Defs.' Resp. Opposing Pls.' Mot Remand ["Reply"] at 2–3, ECF No. 43). Plaintiffs argue that this distinguishing fact was central to the decision in Mayo and direct the Court's attention to language stating that "the nonsigning attorneys for the defendants" do not "lack accountability to the court when they will be before the court within days of the removal, signing papers and otherwise performing as officers of the court." See Mayo, 713 F.3d at 742.

While the Court appreciates Plaintiffs' creativity, it nonetheless finds that the holding in Mayo is unambiguous and controls: "a notice of removal signed and filed by an attorney for one defendant representing unambiguously that the other defendants consent to the removal satisfies the requirement of unanimous consent for purposes of removal." Id. This is precisely what happened here. Further, the "accountability to the court" the Fourth Circuit references in Mayo may still come in the form of Rule 11 sanctions that the Court may levy on an attorney falsely representing that he obtained unanimous consent prior to removal. In any event, dicta in which the Fourth Circuit articulated additional facts of the case did not qualify or create additional prerequisites for the Court's clear holding. The Fourth Circuit may one day wish to revisit or narrow its holding in Mayo; until that happens, the Court will apply its plain and unambiguous holding.

**2.     Federal Question Jurisdiction**

Next, Plaintiffs argue that remand is required because federal question jurisdiction does not exist. Defendants respond that Plaintiffs' claims necessarily raise federal questions and arise under federal law and therefore this Court should retain jurisdiction. At bottom, the Court finds that Plaintiffs' claims are completely preempted by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq. ("ERISA"), and therefore the Court has federal question jurisdiction over this matter.

Federal question jurisdiction generally exists under 28 U.S.C. § 1331 when plaintiffs are "pleading a cause of action created by federal law." McFeely v. Wells Fargo Bank, NA, --- F.Supp.3d ---, No. CCB-21-01390, 2021 WL 4988462, at *1 (D.Md. Oct. 26, 2021) (quoting Grable & Sons Metal Prod., Inc. v. Darue Eng'g & Mfg., 545 U.S. 308, 312 (2005)). An exception to the general rule exists where claims facially arising under state law "'necessarily raise[] a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance' of federal and state power." Id. (quoting Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning, 578 U.S. 374, 383 (2016)); accord Burrell v. Bayer Corp., 918 F.3d 372, 378–79 (4th Cir. 2019) (framing alternative federal question jurisdiction as an "exception").

Federal question jurisdiction also exists where a state law claim asserted by a plaintiff is completely preempted by federal law. Complete preemption occurs when federal law "so completely pre-empt[s] a particular area that any civil complaint raising this select group of claims is necessarily federal in character." Metropolitan Life Ins. v.

Taylor, 481 U.S. 58, 63–64 (1987); see also Beneficial Nat'l Bank v. Anderson, 539 U.S. 1, 11 (2003) (finding complete preemption where federal law provides "the exclusive cause of action for such claims"). If there is complete preemption, "the federal claim is treated as if it appears on the face of the complaint . . . thereby justifying removal." Lontz v. Tharp, 413 F.3d 435, 441 (4th Cir. 2005). "[C]omplete preemption thus prevents plaintiffs from 'defeat[ing] removal by omitting to plead necessary federal questions.'" Id. at 440 (quoting Franchise Tax Bd. v. Constr. Laborers Vacation Tr., 463 U.S. 1, 22 (1983)).

Defendants argue that Plaintiffs' claims are completely preempted by ERISA. ERISA's preemption provision is "'broad' and 'expansive.'" Marks v. Watters, 322 F.3d 316, 322 (4th Cir. 2003) (quoting Pilot Life Ins. v. Dedeaux, 481 U.S. 41, 47 (1987)). Section 514(a) of ERISA provides preemption to "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). "For ERISA preemption purposes, 'State law' includes both statutory and common law." Custer v. Sweeney, 89 F.3d 1156, 1166 (4th Cir. 1996). In Shaw v. Delta Air Lines, Inc., the Supreme Court held that "[a] law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." 463 U.S. 85, 96–97 (1983). The Fourth Circuit has held that there are three essential elements for finding complete preemption under ERISA:

> (1) the plaintiff must having standing under [29 U.S.C. § 1132(a)] to pursue its claim; (2) its claim must fall[] within the scope of an ERISA provision that [it] can enforce via [§ 1132(a)]; and (3) the claim must not be capable of resolution without an interpretation of the contract governed by federal law, i.e., an ERISA-governed employee benefit plan.

11

Sonoco Prods. Co. v. Physicians Health Plan, Inc., 338 F.3d 366, 372 (4th Cir. 2003) (internal quotation marks and citations omitted).

Plaintiffs have standing to sue under ERISA. As both a participant and beneficiary of the Plan, Evans plainly has standing. See 29 U.S.C. § 1132(a)(2) ("A civil action may be brought . . . by a participant, beneficiary or fiduciary."); id. § 1002(7) (defining a "participant" as "any employee . . . who is or may become eligible to receive a benefit of any type from an employee benefit plan"); id. § 1002(8) (defining a "beneficiary" as "a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder"). Evans Consulting also has standing by dint of its role as a fiduciary to the Plan. See id. § 1002(21)(A) (providing that a person is a fiduciary of a plan to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan").

Plaintiffs' claims also fall within the scope of an ERISA provision enforceable under § 1132. With respect to Plaintiffs' breach of fiduciary duty claim, § 1132(a)(2) empowers plaintiffs to seek relief under 29 U.S.C. § 1109, which in turn provides that "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable" for plan losses and fiduciary profits resulting from the breach. See id. § 1109(a); (Am. Compl. ¶¶ 82–87 (describing Defendants' alleged breaches of their fiduciary duties with respect to the sale and administration of the Plan)). For similar

reasons, Plaintiffs claims of negligence and unjust enrichment also fall within the scope of an ERISA provision enforceable under § 1132. See id. § 1132(a)(3) (permitting "a participant, beneficiary, or fiduciary" to "obtain equitable relief" to "redress" "violat[ions of] any provision of this subchapter or the terms of the plan"); (Am. Compl. ¶¶ 72–77 (describing Defendants' alleged negligence with respect to the sale and administration of the Plan);[3] ¶¶ 97–98 (describing Defendants' alleged unjust enrichment arising from their sale and administration of the Plan)). Plaintiffs' declaratory judgment claim is derivative of its other claims and to the extent they are preempted, so is it. See Baumgartner v. Balt. Gas & Elec. Co., No. CCB-03-1770, 2004 WL 964205, at *3 (D.Md. Apr. 27, 2004) ("[Plaintiff's] characterization of his cause of action as a claim for declaratory relief under state law is not controlling. . . . [T]he complaint states a claim under ERISA, giving this court federal question jurisdiction . . . ."); Coppedge v. Blue Cross Blue Shield of S.C., No. 3:21-CV-00625-JMC, 2022 WL 820018, at *3 (D.S.C. Mar. 18, 2022) ("[L]ogically if preemption is appropriate for the substantive state law claims based on satisfaction of the

---

[3] Plaintiffs argue that under Coyne & Delany Co. v. Selman, 98 F.3d 1457 (4th Cir. 1996), their claims are not subject to ERISA because they are mere "garden-variety malpractice claim[s]." See id. at 1460; (Mot. at 9–10). But the Fourth Circuit in Coyne held that "ERISA does not preempt [Plaintiff's] garden-variety malpractice claim asserted against the defendants in their (non-fiduciary) capacities as insurance professionals." 98 F.3d at 1460. This is not the case here, where Plaintiffs expressly advance negligence claims against all Defendants and breach of fiduciary duty claims against all but one of the Defendants. (See generally Am. Compl. ¶¶ 71–88). Further, Coyne contained no discussion of remand or jurisdictional issues; on the contrary, the plaintiff in that case asserted fiduciary duty claims related to an ERISA plan and the court exercised jurisdiction over all claims. See 98 F.3d at 1465–66.

Sonoco requirements, it follows that the same basis for preemption would apply to the claim for declaratory judgment under state law.").

The Fourth Circuit and this Court have routinely found that unjust enrichment and negligence claims arising from the administration of an ERISA-covered plan "related to" an ERISA-covered plan for preemption purposes. See Elmore v. Cone Mills Corp., 23 F.3d 855, 863 (4th Cir. 1994) ("Plaintiffs asserted state law claims for . . . unjust enrichment, breach of fiduciary duty, [and] negligence . . . in an attempt to enforce representations made in connection with . . . an ERISA-covered employee benefit plan. . . . [A]ll of these claims clearly 'relate to' an ERISA-covered plan . . . ."); Cecil v. AAA Mid-Atl., Inc., 118 F.Supp.2d 659, 665–66 (D.Md. 2000) (finding that claims of negligence and unjust enrichment arising from mismanagement in the administration of an ERISA plan were preempted); Essex v. Randall, No. DKC 2003-3276, 2005 WL 600335, at *5 (D.Md. Mar. 15, 2005) ("Unjust enrichment claims, like other state common law tort and contract claims, are generally preempted by ERISA."). Indeed, Plaintiffs' claims fundamentally challenge in part "the administration of the ERISA plan—a core [§ 1132](a) claim." Prince v. Sears Holdings Corp., 848 F.3d 173, 178 (4th Cir. 2017).[4] For all these reasons, the

---

[4] Plaintiffs repeatedly profess that they do not allege maladministration of the Plan, but rather that Defendants ought not to have sold them the Plan. (See, e.g., Reply at 12). But this characterization does not square with the allegations in the Amended Complaint. (See, e.g., Am. Compl. ¶¶ 45–59, 64, 67–68). Indeed, Plaintiffs reference Defendants' alleged maladministration—not limiting their allegations to Defendants' allegedly wrongful sale of the Plan—in the paragraphs detailing each count. (See, e.g., Am. Compl. ¶ 77(h) (alleging that Defendants failed "to exercise reasonable care to advise Evans Consulting and Evans how to limit the losses or mitigate their damages **after the illegal and unsuitable benefit plan was created and funded**"); ¶ 86(h) (same)). Thus, the Court disagrees with Plaintiffs' assertion that "[t]he Amended Complaint . . . does not allege that

Court finds that Plaintiffs' claims fall within the scope of an ERISA provision enforceable under § 1132.

Finally, resolution of Plaintiffs' claims requires interpretation of the Plan, which is a "contract governed by federal law, i.e., an ERISA-governed employee benefit plan." Sonoco, 338 F.3d at 372; see Quality Air Servs., LLC v. DiPippo, No. JFM-12-3338, 2013 WL 693052, at *1 (D.Md. Feb. 25, 2013) ("[R]esolution of this dispute requires interpretation of the plan's provisions, at least for the purpose of determining the amount of the loss suffered by the plan."). Plaintiffs' Amended Complaint includes several allegations regarding the specific deficiencies of the Plan and how those deficiencies have caused Plaintiffs substantial monetary harm. (See, e.g., Am. Compl. ¶¶ 64–69). There is no way for a court to resolve whether Plaintiffs are correct about those alleged Plan deficiencies—or whether the Plan's issues were prompted by or resulted in negligence, breaches of fiduciary duty, or unjust enrichment—without interpreting the Plan. Because all three Sonoco elements are satisfied, Plaintiffs' claims are completely preempted by ERISA, giving this Court federal question jurisdiction. Plaintiffs' Motion must be denied.

---

the plan was mismanaged, mis-invested, or otherwise mishandled once it was opened." (See Reply at 12).

Similarly, Plaintiffs' assertion that the Court "will not be called upon to consider the appropriateness of actions taken in managing or funding the plan," (see Reply at 13), appears plainly contradicted by the Amended Complaint, which alleges, for example, that Defendants failed "to appropriately select funding products for the Plan," (see Am. Compl. ¶ 77(i)). For this reason, the various distinctions Plaintiffs advance between their case and a series of other decisions by this Court and the Fourth Circuit are unpersuasive. (See Reply at 12–15).

## III.      CONCLUSION

For the foregoing reasons, the Court will deny Plaintiffs' Motion to Remand (ECF No. 29). A separate Order follows.

Entered this 16th day of May, 2022.

/s/
George L. Russell, III
United States District Judge